**Marc P. Berger**
**Lara S. Mehraban**
**Sheldon L. Pollock**
**John O. Enright**
***Attorneys for Plaintiff***
**U.S. SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, NY 10281-1022**
**Phone: (212) 336-9138 (Enright)**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**-against-**<br><br>**PARMJIT (a/k/a PAUL) PARMAR, SOTIRIOS (a/k/a SAM) ZAHARIS, and RAVI CHIVUKULA,**<br><br>**Defendants.** | **18 Civ._____ ( )**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff U.S. Securities and Exchange Commission ("Commission"), for its Complaint against defendants Parmjit (a/k/a Paul) Parmar ("Parmar"), Sotirios (a/k/a Sam) Zaharis ("Zaharis"), and Ravi Chivukula ("Chivukula") (together, "Defendants"), alleges as follows:

**SUMMARY**

1. Defendants orchestrated a scheme to fraudulently induce Investor-1, the family office of a high-net-worth individual, to acquire Constellation Healthcare Technologies, Inc. ("CHT"), an issuer and medical-billing business then publicly traded on the London Stock Exchange's Alternative Investment Market ("AIM"), in a "go-private transaction," i.e., a transaction where a publicly traded company is converted into a private entity.

2. Defendants fraudulently induced Investor-1 to enter into the go-private transaction by, among other things, making material misrepresentations to it about CHT's historical and expected future revenues and earnings before interest, taxes, depreciation, and amortization ("EBITDA"), including the revenues and EBITDA of three fictitious subsidiaries that did not in fact exist; and CHT's purported customer base, including purported customers of the three fictitious subsidiaries.

3. To further their scheme, Defendants brazenly fabricated and falsified scores of documents that they then gave to Investor-1 and professional advisors representing Investor-1, including sham acquisition agreements, financial statements, customer agreements, invoices, and due-diligence materials.

4. On January 30, 2017, Defendants and Investor-1 consummated the go-private transaction, which valued CHT at approximately $309.4 million, or $3.36 per share, an approximately 45% premium to CHT's stock price.

5. Investor-1 financed the go-private transaction with a combination of approximately $88.6 million in cash that it contributed, $130 million in syndicated debt arranged by a national bank, and approximately $40 million in unsecured promissory notes issued by CHT. After the transaction was consummated, Investor-1 owned approximately 50.7% of CHT's outstanding equity and 55% of CHT's voting equity. Parmar and entities he controlled received at least $55.2 million in exchange for their shares of CHT.

6. In September 2017, after concerns about CHT's financial condition had been raised, Parmar resigned as CHT's chief executive officer and as a CHT director. That same month, CHT's board of directors placed Zaharis and Chivukula on administrative leave.

7. On March 16, 2018, CHT and its affiliated entities filed a Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the Eastern District of New York, citing their inability to service, among other things, the approximately $130 million in debt issued in connection with the go-private transaction.

**VIOLATIONS**

8. As a result of the foregoing conduct and as alleged further herein, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

9. Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

**JURISDICTION AND VENUE**

10. The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking a final judgment: (a) restraining and permanently enjoining Defendants from engaging in the acts, practices, and courses of business alleged against them herein; (b) ordering Defendants to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts; (c) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and (d) imposing permanent officer-and-director bars on Defendants pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C.§ 78u(d)(2)] as a result of the violations alleged in this Complaint.

11. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

12. Defendants have, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails.

13. Venue lies in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Defendants reside in the District of New Jersey and/or resided there during the relevant period. In addition, many of the acts, practices, events, transactions, communications, courses of business, and other matters alleged herein occurred in the District of New Jersey. Among other things, Defendants made fraudulent and misleading statements to Investor-1 by telephone and email while in this District and met with a representative of Investor-1 in the District of New Jersey in connection with Investor-1's performance of due diligence for the go-private transaction.

## DEFENDANTS

14. **Parmar**, age 48, resides at 19 Colts Gait Lane, Colts Neck, New Jersey. Parmar was the chief executive officer and a director of CHT from approximately June 2013 to September 2017, when he resigned.

15. **Chivukula**, age 57, resides at 18 Dunnerdale Road, Morris Plains, New Jersey. Chivukula was the chief financial officer and secretary of CHT from approximately June 2013 to July 2015 and secretary of CHT from July 2015 to September 2017, when CHT's board placed him on administrative leave.

16. **Zaharis**, age 50, resided at 1304 Plaza Drive, Woodbridge, New Jersey during the relevant period of time. Zaharis was the chief financial officer of CHT from approximately July 2015 to September 2017, when CHT's board placed him on administrative leave.

**RELEVANT ENTITIES**

17. **Orion HealthCorp, Inc.** ("Orion") is a Delaware corporation that has its principal place of business in Roswell, Georgia. Orion has not been registered with the Commission since December 2007.

18. **CHT** is a Delaware corporation that has its principal place of business in Houston, Texas. CHT has never been registered with the Commission in any capacity.

19. **Investor-1** is a New York limited liability company that has its principal place of business in New York, New York. Investor-1 has never been registered with the Commission in any capacity.

**FACTS**

**Parmar Creates CHT**

20. In June 2013, Parmar used a special purpose vehicle called Constellation Healthcare, LLC to acquire all of the issued equity capital of Orion, which owned a number of subsidiary medical-billing businesses, for the purpose of acquiring additional medical-billing businesses.

21. On September 3, 2014, Parmar incorporated CHT for the purpose of acting as the holding company for Orion and its subsidiaries, and to list the company's shares on the AIM.

22. On December 8, 2014, CHT was admitted to trading on the AIM. At that time, CHT immediately held Orion, which in turn was the parent of eight subsidiary companies in the medical-billing business.

**Defendants Orchestrate CHT's Purported Acquisitions of Three Sham Medical-Billing Businesses**

23. Between approximately September 2015 and March 2016, CHT issued press releases announcing acquisitions of three profitable U.S.-based medical-billing businesses. In reality, these purported acquisitions were sham transactions.

24. The sham acquisitions each followed the same general blueprint: first, CHT would raise capital by conducting a secondary offering of its common stock on the AIM; second, Defendants would incorporate a sham acquisition target shortly before the purported acquisition date and thereafter create a sham acquisition agreement; and third, Defendants would misappropriate the proceeds of the offerings and re-characterize intercompany transfers of the proceeds as revenues from other CHT subsidiaries.

***The Sham NorthStar First Health LLC Acquisition***

25. On May 13, 2015, CHT issued a press release announcing its intent to raise approximately $20.3 million in a secondary equity offering on the AIM for the purpose of acquiring U.S. medical-billing businesses.

26. On June 3, 2015, CHT's board approved the issuance of up to 7,819,427 shares onto the AIM, which, according to CHT's financial statements, CHT sold for approximately $20 million.

27. On September 16, 2015, CHT announced in a press release its acquisition of NorthStar First Health LLC ("NorthStar") for consideration of up to $18 million. CHT claimed in the press release that NorthStar was a U.S.-based medical-billing business with 233 employees, 77 clients, and 2014 year-end revenue of $7.9 million and EBITDA of $1.9 million. The press release included quotes from both Parmar and Zaharis praising the purported acquisition.

28. Parmar was quoted as saying, among other things, "We continue to secure revenue and earnings enhancing businesses in the healthcare services space to complement our existing platform. NorthStar has an impressive senior leadership team, client coverage and technology suite which fits neatly into our long term vision for our Company."

29. Zaharis was quoted as saying, among other things, "I expect that the full synergistic benefit of this acquisition to come through later this year and over the first half of 2016. We continue to build an impressive pipeline of accretive transactions in our effort to consolidate the US healthcare services space."

30. In reality, Defendants themselves had formed NorthStar under Delaware law on June 12, 2015. NorthStar had no assets or operations at the time of its formation.

31. Email correspondence among Defendants demonstrates that CHT's purported acquisition of NorthStar was in fact a sham. For example, on August 5, 2015 Chivukula emailed to Parmar and Zaharis a purported NorthStar "Due Diligence Report" backdated to July 15, 2015 that, according to its metadata, he created that day. The report described NorthStar as a functioning medical-billing business that had earned $1.9 million in EBITDA in 2014 and more than $2.1 million in EBITDA through June 30, 2015.

32. On August 25, 2015, the Defendants formed NorthStar FHA LLC ("NorthStar FHA"), an entity purportedly related to NorthStar, under Delaware law.

33. On August 26, 2015, the Defendants created an "Operating Agreement of NorthStar FHA, LLC" dated August 26, 2015 that Parmar signed on behalf of Orion as a member of NorthStar FHA.

34. The Defendants then created a sham "Unit Purchase Agreement" dated September 16, 2015 between and among NorthStar, NorthStar FHA, and Bobby Kumar, the purported

owner of all of NorthStar's outstanding equity. The agreement provides that NorthStar FHA will purchase NorthStar for more than $11.5 million in cash by January 31, 2016 and certain additional consideration. The agreement is signed by Parmar on behalf of NorthStar FHA and "Bobby Kumar" on behalf of NorthStar.

35. On September 2, 2015, two weeks before the press release announcing the purported NorthStar acquisition, the Defendants caused NorthStar to acquire a genuine medical-billing business for $2,785,000. Because NorthStar's only asset was the genuine medical-billing business that cost $2,785,000, CHT's stated purchase price of up to $18 million for NorthStar overvalued NorthStar by more than $15 million.

***The Sham Phoenix Health LLC Acquisition***

36. On September 18, 2015, CHT announced in a press release its acquisition of Phoenix Health LLC ("Phoenix"), another purported medical-billing business, in a cash and stock transaction for maximum consideration of $14 million. The press release stated that the acquisition was funded in part from the secondary equity offering conducted earlier in the year and from cash generated from operations.

37. The press release went on to claim that for the 2014 fiscal year Phoenix had 138 employees and net assets of $1.1 million, and had generated $9.8 million in revenue and $2.2 million of EBITDA. The Phoenix press release, similar to the NorthStar press release, quoted both Parmar and Zaharis praising the purported acquisition.

38. Parmar was quoted as saying, "This transaction will allow CHT to develop an additional skill set and a lucrative revenue source in the workplace and automobile healthcare processing segment. This, coupled with efficiencies we will provide with our existing platform

and technology suite, will make this acquisition accretive to shareholders and further cement our consolidated position of being one of the largest healthcare services companies in the US."

39. Zaharis was quoted as saying, "This acquisition clearly demonstrates to the market that our scaled platform is conducive to complementary business lines that will increase revenue and earnings for the business as a whole. There is real momentum in our business across all areas including organic growth."

40. In reality, Phoenix was a sham with no offices or operations. Emails among Defendants show that they created another backdated sham acquisition agreement in an attempt to paper over their fraud. For example, on November 18, 2015, two months after the purported Phoenix acquisition, Zaharis emailed Parmar a copy of the purported NorthStar FHA-Kumar purchase agreement, and admitted, "We have to create a Phoenix sale agreement much like the NorthStar one . . . . I need your help to fill out the following for the Phoenix . . . For NorthStar we had 'Barry Kumar' . . . *who will we have for Phoenix*? . . . Phoenix [press release] has maximum $14m and 75% cash and 25% shares. *What numbers do I out* [sic] *in the sale document*?" (emphasis in original).

41. On November 27, 2015—i.e., more than two months after the claimed date of acquisition—Defendants obtained a Tax Identification Number ("TIN") for Phoenix.

42. On February 1, 2016, Chivukula emailed to Zaharis a Microsoft Word version of an "Asset Purchase Agreement" backdated to September 14, 2015 between and among Phoenix; Sage Group Consulting Inc. ("Sage"), a purported medical-billing business; and Salil Sharma ("Sharma"), Sage's purported sole equity owner. The agreement provided that Phoenix would purchase Sage from Sharma for $7.5 million in cash at closing, $3 million in deferred payments, and certain additional consideration.

43. Parmar signed the Phoenix-Sage-Sharma Asset Purchase Agreement on behalf of "Constellation Healthcare Technologies," despite the fact that the buying entity was Phoenix.

***The Sham MDRX Medical Billing LLC Acquisition***

44. On December 11, 2015, CHT issued a press release announcing its intent to raise approximately $45.5 million in a secondary equity offering on the AIM for the purpose of acquiring MDRX Medical Billing LLC ("MDRX"), a purported Akron, Ohio-based medical-billing business with which it had entered into a conditional share purchase agreement for up to $30 million.

45. On January 6, 2016, CHT's board approved the issuance of 18,751,195 shares onto the AIM, which CHT sold for approximately $45 million.

46. On February 10, 2016, CHT issued a press release announcing its successful acquisition of MDRX for $28 million in cash paid on completion of the transaction and an additional $2 million due to be paid over the following two years. Like the NorthStar and Phoenix press releases, the MDRX press release quotes Parmar praising the acquisition.

47. Parmar was quoted as saying, among other things, that "The closing of the MDRX transaction will further increase CHT's revenue and significant cost savings will be borne out by MDRX being part of the CHT platform. . . . With this transaction completed CHT will collect approximately $2 billion annually for physicians across the US and will increase our footprint in new territories."

48. In reality, MDRX too was a fabrication that Defendants had created based on a genuine Akron, Ohio-based medical-billing business (the "Real Medical-Billing Business"). In October 2015, CHT was contacted by an investment bank about a potential acquisition of the Real Medical-Billing Business.

49. CHT entered into a non-disclosure agreement with the investment bank, which in turn gave Defendants a Microsoft PowerPoint presentation pitching the Real Medical-Billing Business.

50. On November 2, 2015, Parmar issued an "Indication of Intent" letter to the Real Medical-Billing Business for a proposed acquisition price of $13 million, but the parties did not consummate the transaction.

51. The Defendants then altered the investment bank's PowerPoint presentation pitching the Real Medical-Billing Business to create a sham MDRX "Due Diligence Findings Draft Report" dated October 20, 2015. The sham MDRX report essentially left the entire description of the Real Medical-Billing Business, including the company's organizational chart, untouched, but inflated the company's financials and simply changed the company's name to MDRX, an entirely fictitious entity.

52. Emails among Defendants evidence their fabrication of MDRX. On October 22, 2015, Chivukula forwarded the MDRX PowerPoint to Parmar and Zaharis, noting, "Attached is the updated internal document and presentation. *I am not able to remove the background image of [the Real Medical-Billing Business] in the presentation*." (emphasis added).

53. In addition, on December 11, 2015, after CHT had issued its press release announcing the acquisition, an investment banker who had pitched the Real Medical-Billing Business to CHT emailed Zaharis and asked about the apparent similarities between MDRX and the Real Medical-Billing Business. He stated, "In reading the press release we noticed that the company description appears nearly identical to the [Real Medical-Billing Business] description in our Confidential Information Memorandum. . . . As we are not familiar with MDRX, we

wanted to confirm with you which of these facts are in fact correct and which may have been clerical errors. Please advise."

54. Zaharis forwarded that email to another CHT director, saying "Not good," to which the CHT director responded, "Oh fuck."

55. Three days later, Zaharis sent Parmar an email with the subject line "Speech for the Broker of [the Real Medical-Billing Business]" that attached talking points for him to use during a telephone conversation with the investment bank, including the following: "Your client was one of the 6 in the pipeline that we felt was good enough to try and see if we could buy right after the MDRX acquisition . . . We had presented a similar business case to the Board and our Bankers for approval which was granted . . . The descriptions of the business apparently got mixed up. The PR company got hold of the wrong 'book' and wrote the press release."

56. Relatedly, on October 3, 2016 Parmar wrote an email to Zaharis and a CHT director concerning an inquiry from a journalist about CHT. Parmar stated, among other things, that, "[i]t could be they reached out to the MDRX description company in Ohio and they must have said no we never sold to CHT? or a confusing reply? Like we know them, they apologized that the material in [the press release] points to them but we bought someone else?"

57. Next, the Defendants created a sham "Asset Purchase Agreement" between and among MDRX Billing LLC; Apex Healthcare Systems ("Apex"), another fictitious entity the Defendants created; and "Jackson Wright," Apex's fictitious sole equity holder. The agreement provides that MDRX will purchase Apex for $31.8 million in cash and certain additional consideration. The agreement is signed by Parmar on behalf of MDRX and "Jackson Wright" on behalf of Apex.

58. The Defendants also created fictitious agreements between Apex and its fictitious customers that they then gave to Investor-1. One such "Billing Services Agreement" dated November 1, 2015 is between Apex and "Helmstein General Health" and is signed by "Jackson Wright" on Apex's behalf.

59. The Defendants did not even form MDRX under Delaware law until December 7, 2015 and did not obtain a TIN for the company until March 11, 2016.

60. To further the illusion that MDRX was a real subsidiary earning real revenues, Defendants created and emailed to each other entirely fabricated bank account statements for MDRX and altered authentic bank account statements for CHT affiliates like Orion that added multi-million dollar wire transfers from Apex with instructions noting "MDRX."

**The Defendants Fraudulently Induce Investor-1 to Acquire CHT in a Go-Private Transaction**

61. In April 2016, Parmar and representatives of Investor-1 first met to discuss a potential transaction in which Investor-1 would acquire CHT in a go-private transaction.

62. From April 2016 to January 30, 2017, when the go-private transaction was consummated, Defendants made numerous materially false and misleading statements to Investor-1's principals that they knew, or were reckless in not knowing, were false and misleading, and created and gave to them numerous false and fabricated documents concerning CHT that they knew, or were reckless in not knowing, were false and misleading.

63. Investor-1 relied on Defendants' materially false and misleading statements and false and fabricated documents in determining whether to enter into the transaction.

64. For example, on May 19, 2016 Chivukula created and emailed to Investor-1 a spreadsheet titled "Constellation Consolidated Financial Model v2 – CC Capital" that included, among others, the materially false statement that between January 2015 and May 2016, MDRX

had earned $1.78 million in EBITDA. Chivukula knew, or was reckless in not knowing, that MDRX had not earned $1.78 million in EBITDA between January 2015 and May 2016.

65. On June 9, 2016 Parmar forwarded an email to Investor-1 that Chivukula had sent to him and Zaharis, attaching three spreadsheets, including a consolidated financial model for CHT containing a number of false statements. Among other things, the spreadsheet falsely claimed that in 2015 CHT had total revenues of more than $108 million and approximately $25 million in EBITDA, including the fictitious revenues from NorthStar, Phoenix, and MDRX. Parmar knew, or was reckless in not knowing, that in 2015 CHT did not have total revenues of more than $108 million or EBITDA of approximately $25 million.

66. On June 24, 2016, Parmar emailed Investor-1 a PowerPoint presentation containing a number of false statements about CHT, including a page titled "Successful History of Acquisitions and Integration" that extolled the fictitious NorthStar, Phoenix, and MDRX acquisitions. Parmar knew, or was reckless in not knowing, that NorthStar, Phoenix, and MDRX were not bona fide businesses that CHT had actually acquired.

67. On June 24, 2016, in response to a question from Investor-1, Chivukula sent Investor-1 an email stating that MDRX's EBITDA for the first quarter of 2016 was "$446,070," which was false because MDRX, a fictitious entity, had no earnings. Chivukula knew, or was reckless in not knowing, that MDRX did not earn $446,070 in EBITDA for the first quarter of 2016.

68. On June 26, 2016, Parmar emailed Investor-1 a PowerPoint presentation in advance of an in-person meeting the following day with Investor-1 and its advisers. The presentation falsely stated, among other things, that CHT had conducted diligence on Phoenix between July 2014 and June 2015 and acquired it between July and December 2015; and that

CHT had conducted diligence on MDRX between July and December 2015 and acquired it between January and May 2016. Parmar knew, or was reckless in not knowing, that those statements were false because CHT had never in fact conducted diligence or acquired real entities called Phoenix or MDRX.

69. On June 29, 2016, Investor-1 asked Chivukula in an email whether "the LTM [i.e., last twelve months] 2015 numbers include MDRX in all periods?" Chivukula responded, "Yes [Investor-1 representative], that is correct." Chivukula knew, or was reckless in not knowing, that that statement was false because MDRX was a fictitious entity with no revenues or EBITDA.

70. On July 17, 2016, Parmar emailed Investor-1 a "Revenue Analysis" spreadsheet that included a list of 682 purported CHT customers, including 44 purported MDRX customers and 71 purported Phoenix customers. Parmar knew, or was reckless in not knowing, that MDRX and Phoenix did not in fact have any customers.

71. On July 21, 2016, Chivukula emailed a series of spreadsheets to one of Investor-1's advisers, copying Zaharis. Zaharis then forwarded that email, including its attachments, to one of Investor-1's principals. The spreadsheets purported to detail the pre-acquisition financial statements for, among others, MDRX, NorthStar, and Phoenix. Chivukula knew, or was reckless in not knowing, that the financial statements overstated, among other things, MDRX's, NorthStar's, and Phoenix's purported revenues because they were fictitious entities.

72. On July 19, 2016, Chivukula emailed Investor-1 a spreadsheet titled "US job transitioned," which, among other things, claimed to represent the number of employees that Phoenix had transititioned to CHT. At the time of the email, Chivukula knew, or was reckless in not knowing, that Phoenix had not transitioned any employees to CHT.

73. On January 24, 2017, Zaharis created and emailed to Investor-1 a spreadsheet titled "Constellation Consolidated Financials – Sep 2016.xlsx," which falsely stated, among other things, that as of September 30, 2016, MDRX had more than $4.96 million in accounts receivable and $30.96 million in goodwill." Zaharis knew, or was reckless in not knowing, that those statements were false because MDRX, a fictitious entity, had no accounts receivable or goodwill.

**Investor-1 Acquires CHT on January 30, 2017**

74. On January 30, 2017, CHT, operating through Defendants, consummated the go-private transaction with Investor-1. The transaction valued CHT at $309.4 million, or $3.36 per share, a 45% premium to CHT's current stock price. The transaction was structured as follows: Investor-1 contributed approximately $88.6 million of cash to acquire 50.7% of CHT's outstanding equity and 55% of CHT's voting equity; a syndicate of banks provided a $130 million credit facility, and CHT issued $39.6 million in unsecured promissory notes to its shareholders.

75. As a result, Parmar and entities he controlled were paid at least $55.2 million in cash in exchange for their shares of CHT.

**Parmar Resigns from CHT and Chivukula and Zaharis Are Placed on Administrative Leave**

76. By September 2017, Investor-1 had raised questions about CHT's financial condition based on its interactions with Defendants.

77. At a September 14, 2017 CHT board meeting, Parmar resigned as the chief executive officer of CHT and its subsidiaries.

78. On September 28, 2017, CHT retained a business advisory firm to conduct a forensic investigation of CHT's financial condition.

79. At a September 29, 2017 CHT board meeting, which was attended by members of the business advisory firm, Parmar told the board that MDRX was not performing and then resigned as a CHT director and/or manager of CHT and its subsidiaries.

**CHT Files for Bankruptcy**

80. On March 16, 2018, CHT filed a Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the Eastern District of New York, citing, among other things, its inability to service the $130 million in debt it incurred in the go-private transaction.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**
**(All Defendants)**

81. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 80 of this Complaint.

82. Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

83. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**(All Defendants)**

84. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 80 of this Complaint.

85. The Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

86. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

**I.**

Permanently enjoining Defendants, their respective agents, servants, employees, and attorneys, and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Defendants to disgorge any ill-gotten gains they received directly or indirectly, with prejudgment interest thereon, as a result of the violations alleged in this Complaint;

**III.**

Ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**IV.**

Ordering Defendants to be barred from serving as an officer or director of an issuer pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C.§ 78u(d)(2)] as a result of the violations alleged in this Complaint; and

**V.**

Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
May 16, 2018

By: s/ Lara S. Mehraban
Marc P. Berger*
Lara S. Mehraban*
Sheldon L. Pollock*
John O. Enright*
*Attorneys for Plaintiff*
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022

Phone: (212) 336-9138 (Enright)

* Not admitted in New Jersey

**LOCAL RULE 11.2 CERTIFICATION**

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is the subject of an action pending in any court, or of any pending arbitration or administrative proceeding, namely, *In re Orion Healthcorp, Inc.*, No. 18-71748 (E.D.N.Y. Bankr. Mar. 16, 2018). The parties to that action, the debtor and its affiliates, are Orion HealthCorp, Inc.; Constellation Healthcare Technologies, Inc.; NEMS Acquisition, LLC; Northeast Medical Solutions, LLC; NEMS West Virginia, LLC; Physicians Practice Plus Holdings, LLC; Physicians Practice Plus, LLC; Medical Billing Services, Inc.; Rand Medical Billing, Inc.; RMI Physician Services Corporation; Western Skies Practice Management, Inc.; Integrated Physician Solutions, Inc.; NYNM Acquisition, LLC; Northstar FHA, LLC; Northstar First Health, LLC; Vachette Business Services, Ltd.; Phoenix Health, LLC; MDRX Medical Billing, LLC; VEGA Medical Professionals, LLC; Allegiance Consulting Associates, LLC; and Allegiance Billing & Consulting, LLC.

s/ Lara S. Mehraban
Lara S. Mehraban
Associate Regional Director
Counsel for Plaintiff
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0591

**DESIGNATION OF AGENT FOR SERVICE**

Pursuant to Local Civil Rule 101.1(f), because the U.S. Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the above-captioned action. Therefore, service upon the United States or its authorized designee, J. Andrew Ruymann, Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 402 East State Street, Room 430, Trenton, NJ 08608, shall constitute service upon the Commission for purposes of this action.

s/ Lara S. Mehraban
Lara S. Mehraban
Associate Regional Director
Counsel for Plaintiff
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0591