UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-------------------------------------------------X
U.S. SECURITIES AND EXCHANGE
COMMISSION,

               Plaintiffs,            **Docket No.: 18-CV-9284-MCA-MAH**

      -against-

PAUL PARMAR, et. al.

               Defendants.
-------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS

Timothy C. Parlatore, Esq.
*Counsel for the Defendant Paul Parmar*
221 River Street, 9th Floor
Hoboken, NJ 07030
212-679-6312
timothy.parlatore@parlatorelawgroup.com

## PRELIMINARY STATEMENT

This case involves a unique set of circumstances, where the head of a private investment firm conspired to purchase a controlling interest in a public company at half its actual value and take it private.  He used bank loans and capital from other investors, rather than his own money to finance the transaction and then assigned responsibility for this debt to the company he had just purchased.   He then orchestrated a fraudulent bankruptcy filing so that he could use straw purchasers to buy that company out of the bankruptcy at a fraction of the cost, with 100% equity and debt free, while leaving the investors and banks with uncollectible debts.  In a brazen move to sideline the minority shareholder and CEO from derailing this elaborate plan, he made false representations to the U.S. Department of Justice ("DOJ"), Federal Bureau of Investigations ("FBI") and U.S. Securities and Exchange Commission ("SEC" or Plaintiff) to have the minority shareholder arrested and falsely charged.  The case at bar was filed by the SEC in reliance upon those false representations.

The factual allegations in the complaint focus on the events leading up to Investor-1's acquisition of a controlling interest in Constellation Healthcare Technologies, Inc. ("CHT") – specifically, a collection of statements allegedly made by Defendant Parmar and his co-defendants to representatives of Investor-1. However, Plaintiff has failed to properly plead a plausible cause of action for fraud

based on these isolated, cherry-picked statements that are completely inconsistent with the "scores of documents" provided by Parmar to Investor-1 that Plaintiff relied upon and incorporated into the complaint by reference, including "acquisition agreements, financial statements, customer agreements, invoices, and due-diligence materials."

Plaintiff's theory that these quoted sections somehow fraudulently induced Investor-1 fails to meet the heightened pleading requirement for fraud cases, as the documents relied upon and incorporated by reference overwhelmingly establish that Investor-1 was given complete and total access to all the actual data and spent over $7 million on due diligence to review that data. It is utterly implausible that such a highly sophisticated investor could spend $7 million on due diligence and then make an investment decision based on a few inaccurate statements made very early in the process by Defendant Parmar, rather than the mountains of data that were subsequently provided.

The documents relied upon by Plaintiff, and incorporated into the complaint by reference, clearly establish that Defendant Parmar gave accurate data and information and, if anyone made fraudulent misrepresentations that induced Investor-1 to invest, it was by at least two individuals, who were not named as defendants – Chinh Chu and Truc To.

This complaint, along with other publicly filed documents in this Court, and

the U.S. Bankruptcy Court for the Eastern District of New York, provide strong evidence that Chinh Chu and Truc To defrauded Investor-1, the banks, the public shareholders of CHT and the bankruptcy court, while engaging in insider trading and obstruction of justice. There is no question that there were irregularities in the books of CHT and the acquisition of CHT by Investor-1. Unfortunately, Plaintiff has selected the wrong defendants in bringing this action. This complaint should be dismissed as to Defendant Parmar.

## STATEMENT OF FACTS

Parmar and other investors acquired Orion Healthcorp, Inc. ("Orion") in June 2013. Orion is a medical billing, collections, and practice management service company, which became a subsidiary of CHT. As CEO of CHT, Parmar grew the company over the next several years through an aggressive growth strategy of acquiring smaller service providers and making them subsidiaries of Orion. The value of these acquisitions to CHT is primarily in their customer lists and relationships, as these medical practices would then be serviced by the main CHT platform.

CHT grew through these acquisitions and went public on the London Stock Exchange's Alternative Investment Market ("AIM") to help raise money to fund the acquisitions. At that time, Orion held eight subsidiary companies and continued with an aggressive acquisition and growth strategy. Most of the shares were held by

various entities, which Parmar managed and controlled (the "Parmar entities").

By the time Parmar wanted to take CHT back private, it had grown to 14 operational subsidiaries, along with several holding companies and Special Purpose Acquisition Companies ("SPAC").  Of these, two SPACs, MDRX Medical Billing, LLC, ("MDRX"), and Phoenix Health, LLC ("Phoenix")[1], had been formed for the purpose of acquiring new subsidiaries using raise ups on the AIM exchange. Unfortunately, while these two raise ups were successful, the acquisitions were not, and the SPACs remained empty shells.[2]

### Chinh Chu discusses Acquiring CHT

Chinh Chu is the senior managing director and founder of CC Capital[3]. Before launching CC Capital, Chinh Chu spent 25 years working at Blackstone, focused on building its Private Equity business.

In February 2016, Parmar and Chinh Chu began discussions of having CC Capital bid on CHT.  Chinh Chu reviewed public data of CHT and the audited

---

[1] Plaintiff has also outlined allegations regarding a third allegedly empty shell, Northstar.  However, this SPAC was filled with an acquisition – Vachette Business Services, LTD.

[2] Plaintiff has alleged that Defendants provided false information, in the form of press releases and financial statements, indicating that these empty shells were actual acquisitions.  For the limited purpose of this motion, these allegations are presumed to be true.

[3] The complaint is unclear as to what entity Investor-1 is, but it appears that Investor-1 may be an investor that Chinh Chu and CC Capital brought to the CHT deal or, may even be CC Capital itself.  Because of this ambiguity, the terms CC Capital and Investor-1 are being used interchangeably here.

financials that Parmar provided.  As they both expected Parmar to remain as CEO and control a significant percentage of the ownership, through the Parmar entities, Chinh Chu wanted Parmar to personally contribute $10 million cash, in addition to the equity of CHT that the Parmar entities owned.

### Negotiations and Due Diligence Begins

As CC Capital submitted their initial bid, CHT formed a Special Committee to work on the proposed merger and review the bids.  As Parmar was part of the buying group, he was recused from the process to ensure no conflicts of interest. The Special Committee hired Duff & Phelps ("D&P") to perform a valuation and issue a fairness opinion and Kirkland & Ellis ("Kirkland") as counsel to the committee.

On CC Capital's side, Chinh Chu hired his loyal friend and then-KPMG partner, Truc To.  Although capable in his job, Truc To's true value was that his loyalty to Chinh Chu took priority over his loyalty to KPMG or his ethical and legal obligations.  Based in Atlanta, Georgia, whenever Truc To travelled to New York to perform work for Chinh Chu, he would stay as a guest in Chinh Chu's home, where Chinh Chu would lavish him with VIP treatment. As a result, Truc To's due diligence reports were guaranteed to reflect what Chinh Chu wanted them to reflect, rather than a fair, honest and fact-based report.

As the due diligence process progressed, Parmar and the team at CHT

produced a significant amount of data and documents to Truc To and his team. Perhaps the most significant of which was to demonstrate and give them access to the Pegasus system, or PARCS, which tracked all collections data, customer information, and fees. Through this system, Chinh Chu and Truc To were able to see all of the true underlying data and read the summary reports. Accurate revenue data was made available to them at the click of a button, making it impossible to plausibly mislead them into believing that there were additional phantom assets, revenue, or employees.

Throughout August 2016, Truc To asked for, and received more and more detailed reports and underlying data, invoices and other documents. CHT provided complete and accurate data to Truc To and KPMG, without any fabrications. With this volume of consistent materials, it would have been impossible to fool even a first-year accounting student, let alone an experienced and very well paid team led by KPMG partner Truc To.

In addition to the absence of data to support the theory that MDRX or Phoenix had any revenue, employees, or contracts, there were several other documents that were glaringly missing:

a. CHT provided payroll records on every subsidiary except the empty shells.

      b.  CHT provided lease documents and other information on the physical offices of every subsidiary except the empty shells.[4]

      c.  CHT provided tax returns and other tax filings on every subsidiary except the empty shells.

Through their due diligence efforts, it is impossible that KPMG's report should have contained anything other than true, accurate data. The only conceivable way for KPMG to have reported inflated revenue and valuation data to Investor-1 is if Truc To either did so intentionally, or was willfully and intentionally blind to the data presented to him by Parmar and CHT.

Contemporaneously, D&P was performing its evaluations to determine the appropriate enterprise value of CHT and compare that to CC Capital's bid. On August 17, 2016, D&P submitted their initial analysis to the Special Committee of the Board of Directors. As discussed more fully in the associated Declaration, this report revealed a number of errors, which led to D&P undervaluing CHT's enterprise value including, *inter alia,* the listing of debts for loans that had already been repaid and an extraordinarily low projected revenue and growth rate. Despite these errors, the report still demonstrated that CHT's value was far in excess of what Chinh Chu

---

[4] This point should have been even more glaring to the highly experienced and highly paid team from KPMG, as a simple google search for the address listed for MDRX, 166 High Street, Akron Ohio does not exist. The closest address, 166 S. High Street, is Akron's City Hall, where the mayor's office is.

was looking to pay. As a result, D&P was unable to issue the expected fairness opinion. The Special Committee met with D&P and agreed that Investor-1's offer was too low and rejected it.

When Parmar communicated this to Chinh Chu, his response was not to raise the bid, but rather to get rid of D&P. While Chu was trying to hatch a plan to counter the D&P fairness issue, he was dealt another blow when the Special Committee rejected his proposed "Modified Market Check" process. Chu hatched a plan to withdraw Investor-1's bid, at which point, Parmar would have to dissolve the Special Committee and terminate the advisors, as there was no active bid to consider. CHT could then form a new committee with more obedient advisors upon the submission of a new bid from CC Capital.

Shortly thereafter, Chinh Chu withdrew Investor-1's offer and CHT's Special Committee was dissolved, resulting in the termination of D&P and Kirkland. Parmar sent Chinh Chu a copy of the D&P report.

## The Second Special Committee

Before submitting a new bid and forming the second Special Committee, Chinh Chu tried to stack the deck in his favor by recommending SunTrust Robinson Humphrey ("SunTrust") to replace D&P. Chinh Chu hoped SunTrust would produce a lower valuation that would allow the deal to go forward at the discounted price.

SunTrust was retained on September 15, 2016 and resigned on September 26, 2016, after a preliminary review showed that, rather than producing the lower valuation that Chinh Chu wanted, their calculations would be even higher than D&P's.

Without a firm willing to issue a fairness opinion, the Special Committee seemed unable to approve any proposed deal with Investor-1. A "go-shop" period was proposed in the alternative, so that the Special Committee could give the impression to shareholders that they tried to get the highest and best offer, but Chinh Chu again meddled in the process. The go-shop provisions were set up in a way that made it almost impossible to expect any legitimate competing bids.

Understandably concerned about a lawsuit from the shareholders, Chinh Chu struck on an extraordinary idea to protect the members of the Special Committee if they accepted his clearly unacceptable bid – he provided them indemnity. By agreeing to indemnify the members of the Special Committee, Chinh Chu essentially gave them a free pass to violate their fiduciary duties and approve an unfair bid – but only if the unfair bid was from Investor-1.

The deal was approved on November 24, 2016, with CHT Holdco, LLC purchasing CHT at a price of $2.93/share in cash, plus $0.43/share in promissory notes, for a total of approximately $309.4 million for the entire company.

The deal was to be financed up to $145 million by Bank of America Merrill

Lynch, with the remainder being paid in cash by Investor-1 and the Parmar entities'
public shares.  Very little is known about how the financing was obtained from Bank
of America ("BofA"), as they communicated directly with Chinh Chu.  BofA sent
commitment letters before any substantial due diligence was performed by KPMG,
did no due diligence of their own and required no audit.  In fact, BofA never
communicated with Parmar, or any other member of CHT.  This is especially
curious, considering that the commitment letters make clear that BofA intended for
CHT to be the borrower, not Invester-1.

Presumably, BofA agreed to provide such significant financing without any
inquiry because they were relying on the word of Chinh Chu, with whom they have
worked before and expected to continue working with on larger deals.[5]  BofA was
not doing any audit or due diligence on the CHT deal because they were relying
solely on the verbal assurances of Chinh Chu –assurances that, on information and
belief, Chinh Chu knew, was reckless in not knowing, or were false, based on Chinh
Chu and Truc To's actual knowledge of the true financial condition of CHT.

**Go Shop Period**

While a "go shop" period ordinarily allows a public company to seek out

---

[5] On August 8, 2018, it was announced that BofA is working with Chinh Chu to take
Dun   &   Bradstreet   private   in   a   $6.9   billion   deal.
https://www.businesswire.com/news/home/20180808005885/en/Dun-Bradstreet-
Enters-Definitive-Agreement-Acquired-Investor

better offers before going private, the terms of CHT's "go shop" were designed to ensure that no other buyer could outbid Investor-1. A massive breakup fee was set and an abnormally short time period of 3-weeks was set, ending on December 24, 2016. This short period, during the holiday season and ending on Christmas Eve was designed to be insufficient for any other bidders to complete any of the research required to submit a competent bid.

Surprisingly, even under these conditions, CHT received much higher offers from two credible bidders. Somehow, Chinh Chu received advance warning of the details of these bids and set out to corruptly influence the Special Committee into rejecting these higher offers.

Chinh Chu then had a letter sent to the board, which intentionally mischaracterized the definition of a superior bid, so that he could falsely paint it as not being superior. Although never explicitly stated, Chinh Chu's intent was to remind the Special Committee that the indemnity provisions were only applicable if Investor-1 was the purchaser, while giving them a pretext to reject the other bids. As the superior bids were still well below the D&P valuations, the Special Committee likely recognized that the only way they could avoid liability would be to accept the inferior bid of Investor-1.

### Financial Times Inquiry

In the middle of the due diligence process, CHT received a series of questions

11

from a reporter at the Financial Times asking about the legitimacy of the acquisitions of Phoenix, Northstar and MDRX[6]. Chinh Chu directed Parmar to retain the services of a public relations firm who could coordinate with the public relations firm that CC Capital had hired to try to prevent the Financial Times story from derailing the deal. While Chinh Chu's efforts delayed the publication of a story, they did not prevent it.

On January 26, 2017, CHT announced that the closing had been delayed. Later that day the Financial Times published an article entitled "The Curious Case of Constellation Health and Blackstone's Former Top Deal Maker."[7] This article discussed the empty shells, concluding that "the cat's cradle of corporate entities and generalised opacity across Constellation's operations could be seen as a red flag to potential investors and financial journalists alike."

While such an article would normally cause a deal like this to be derailed or, at a minimum, be delayed to perform additional due diligence, BofA requested none and Chinh Chu incredibly had the opposite reaction, demanding to immediately close the deal. Apparently Chinh Chu felt no fiduciary duty to either the banks or Investor-1 to investigate and assess his comfort level with the allegations raised in the article because he was already fully aware of the exact financial condition of

---

[6] Even Plaintiff admits that the Financial Times had discovered the problems with MDRX as early as October 3, 2016. *Complaint* ¶56.

[7] A copy of this article is annexed hereto at Exhibit "O."

CHT.

## CHT Deal Closes

On January 30, 2017, over the objections of Parmar, the CHT deal closed, resulting in Investor-1 gaining 51% interest in CHT and the Parmar entities retaining 49%. While this was the expected result, the numbers in the final funds flow document were not. The cash contributed by Investor-1 was lowered to $82,502,160.25 from the $88,687,476.20 originally anticipated and incorrectly pleaded by Plaintiff. Additionally, there were numerous deal related fees of questionable legitimacy and a far higher price tag that would normally attach to a deal of this size. It is hard to imagine that after spending such an outsized amount on due diligence, Truc To and Chinh Chu were able to ignore the basic data that demonstrated CHT's financial condition.

The result of all the above manipulations by Chinh Chu is that Investor-1 was able to purchase a controlling interest in CHT for well below the actual value of the company. Chinh Chu and Truc To were fully aware of the irregularities in CHT's bookkeeping and value, but actively concealed their knowledge from the banks and the investors at Investor-1. On information and belief, although Chinh Chu is the founder and managing director of Investor-1, he did not use any of his own money for this transaction, instead getting the money from his investors and clients of Investor-1. Moreover, he saddled CHT with an enormous amount of bank debt,

although CHT received no consideration for that debt.

While Chinh Chu would have done quite well, financially, by allowing Parmar to continue to run CHT, while cleaning up any recordkeeping issues, and allowing the pending acquisitions to proceed, Chinh Chu had other ideas in mind, to take advantage of those record keeping issues in order to force Parmar out and then use the excessive bank debt that he put on CHT to put it into bankruptcy and steal CHT for himself.

### After Closing[8]

Beginning the day after the closing, Chinh Chu put into motion a plan to get rid of Parmar by questioning various members of CHT if they are aware of any problems with CHT's books or if they are aware of any fraud.  These are inquiries that Chinh Chu and Truc To should have made during the due diligence phase or, at a minimum, prior to closing.  On information and belief, Chinh Chu was already fully aware of the empty shells, but needed a pretext to pretend that he only discovered them after closing so that he could force Parmar out.

That same day, Chinh Chu announced that CHT was hiring Truc To, the KPMG partner in charge of the due diligence process, as CFO of CHT.  This

---

[8] The remainder of the Statement of Facts is relevant only to the branch of Defendant's motion under Rule 12(b)(7), as it contains facts outside of the pleadings and does not rely upon documents that were incorporated into the pleadings by reference.

stunning and unprecedented move reveals that Chinh Chu had given Truc To a significant financial incentive to violate his fiduciary duties to KPMG and Investor-1, to ensure that the due diligence would not derail Chin Chu's plan to acquire CHT at a fraction of the actual value.

Truc To was formally hired in March, 2017. Chinh Chu's edict to hire Truc To was both baffling and ominous, as Truc To may have been good in his job at KPMG, but was underqualified to serve as CFO of CHT. Moreover, the compensation package that Chu wanted to give Truc To was greater than that given to Parmar – equal salary, but Truc To would also receive stock options. The outsized compensation for an unqualified candidate, who had been the head of the due diligence team from KPMG reeked of impropriety. On information and belief, Truc To received this job as a result of an unethical, corrupt, and illegal pact between Truc To and Chu to improperly manipulate the due diligence process to fit with Chu's larger fraudulent scheme.

As Chinh Chu began to pretend that he had just discovered fraud in CHT, he tried to convince Parmar to resign, while excluding him from the operations of the company and telling him that Chinh Chu "accepts" his resignation when, in fact, no resignation was tendered.

At a certain point, Chinh Chu resorted to flagrant extortion, demanding that Parmar wire $10 million within 48 hours, to resolve the issue and stop an

investigation by the FBI and DOJ.

## Fraudulent Bankruptcy

Soon after the merger closed, Chinh Chu began intentionally avoiding any course of action that would increase, or even protect CHT's value or its financial obligations. He halted new acquisitions and ignored offers to purchase the assets at full value so that he could artificially depress CHT's value and push it into bankruptcy.

On Friday, March 16, 2018, Chinh Chu caused CHT and most of its subsidiaries to file Chapter 11 petitions for bankruptcy in the Eastern District of New York. The petitions themselves were fraudulently prepared in many respects, but were necessary for Chinh Chu's planned "phase 2" – stealing the CHT assets for himself. The target objective of Chinh Chu's corrupt design was to end up with all of the valuable assets debt free, while the banks, who Chinh Chu and Truc To fraudulently induced into financing the CHT merger, would be left with uncollectible debt. Chinh Chu set up CHT from the beginning to put it into bankruptcy when he unnecessarily saddled it with enormous debt that should have been a debt owed by Investor-1, not CHT.

The same night that the bankruptcy was filed, John Altorelli, Chinh Chu's personal attorney revealed the plan to Parmar. He explained how Chinh Chu had previously tried to use a straw purchaser to buy CHT's assets for $26 million, but

16

was unsuccessful because the straw purchaser failed to follow his instructions. Altorelli went on to explain that a bankruptcy filing was necessary because "the whole thing can officially go for less than $30 million now."

With a fraudulently filed bankruptcy in place, Chinh Chu then put into motion his elaborate plan to steal all the assets of CHT through the orchestration of two sham auctions.

In both auctions, Chinh Chu presented the Bankruptcy Court with a proposed purchaser who made an extremely low opening bid to act as the "stalking horse." However, these "stalking horses" may have been more accurately described as Trojan Horses, as they concealed a serious and fraudulent secret – they are funded, controlled or arranged by Chinh Chu.  These Trojan Horses were selected ahead of independent bids of substantially higher offers that were made before the bankruptcy was even filed, because Chinh Chu needed a stalking horse willing to conceal his corrupt plans.  Auction procedures were then presented that, like the go-shop period, protected the stalking horses.

The first stalking horse, Medical Transcription Billing, Corp ("MTBC") is a publicly traded company that has operated at a net loss every single year and would have been utterly unable to legitimately offer the $10 million bid it extended for CHT's assets.  Instead, MTBC benefited from a $10.5 million infusion of cash from an unnamed investor just six days before issuing their letter of intent to purchase

17

CHT's assets.

To conceal his insider involvement in MTBC's bid, Chinh Chu arranged for TG Capital, LLC to submit a competing bid on May 17, 2018 for $11,000,000. This competing bid was made solely for creating the appearance that there were competing bids and that the sale of assets was a legitimately competitive process. On information and belief, all bidders were controlled by Chinh Chu in a rigged auction with the outcome predetermined. Because of his corrupt design, MTBC won the auction, buying assets that produce $60-70 million annually, debt free, for the bargain basement price of $12.6 million. MTBC also gained the valuable assets of the Pegasus software programs that tracked accurate collections and revenue data of CHT.

As a tremendous side benefit to rigging the auction with MTBC as his stalking horse, Chinh Chu was also able to use his insider information on the auction and the true value of the assets being purchased to make a significant profit on his stock purchase. Chinh Chu's insider trading on MTBC stock will net him several million dollars profit, which will only increase once MTBC is required to report its unexpectedly high increase in revenue from the CHT assets.

The stalking horse straw purchaser that Chinh Chu selected for the second auction was HealthTek Solutions, LLC ("HealthTek"), with an initial bid of $16.5 million. HealthTek was incorporated solely for purchasing CHT's assets out of the

bankruptcy and had no pre-existing business.  HealthTek was incorporated by TG Capital, the same company that bid against MTBC in the first fraudulent auction.

Healthtek purchased CHT's remaining assets for $16.5 million, a fraction of their actual value.

**Results**

As a result of his complex sophisticated fraudulent scheme, Chinh Chu has achieved, and will continue to achieve significant financial rewards, while spending very little of his own money to do it.  First, he purchased a 51% interest in a $500 million company by taking $88.6 million from his investors, $130 million from the banks, and pocketing over $6 million, while placing all the debt on the asset itself. So, he purchased the asset without any of his own money and without taking on any debt, while pocketing $6 million.

Next, he sidelined the 49% shareholder and put CHT into bankruptcy, where he purchased all the assets out of bankruptcy for $29.1 million, exactly as Altorelli predicted that by entering "phase 2," Chinh Chu could purchase "the whole thing for less than $30 million now." Additionally, he is potentially making a several million dollars profit on his insider trading scheme.

Ultimately, Chinh Chu is making a massive profit of hundreds of millions of dollars, all while falsely portraying himself as the victim.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim upon which relief can be granted." When reviewing a motion to dismiss, courts must first separate the factual and legal elements of the claims and accept all the well-pleaded facts as true. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). All reasonable inferences must be made in the plaintiff's favor. *See In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 314 (3d Cir. 2010).

To survive a motion to dismiss, the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). This standard requires the plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully," but does not create as high of a standard as to be a "probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

The Third Circuit requires a three-step analysis to meet the plausibility standard mandated by *Twombly* and *Iqbal*. First, the court should "outline the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the court should "peel away" legal conclusions that are not entitled to the assumption of truth. *Id*.; *see also Iqbal,* 556 U.S. at 678-79 ("While legal conclusions can provide the framework of a complaint, they must

be supported by factual allegations."). It is well-established that a proper complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). Finally, the court should assume the veracity of all well-pled factual allegations, and then "determine whether they plausibly give rise to an entitlement to relief." *Bistrian*, 696 F.3d at 365 (*quoting Iqbal*, 556 U.S. at 679). A claim is facially plausible when there is sufficient factual content to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The third step of the analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. . . . However, an exception to the general rule is that a 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1426 (3d Cir. 1997). "[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.,* 7 F.3d 357, 368 n.9 (3d Cir. 1993) (*quoting Pension Benefit Guar. Corp. v. White Consol. Indus*.,

998 F.2d 1192, 1196 (3d Cir. 1993)). A court may also consider "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" *Buck v. Hampton Twp. Sch. Dist.,* 452 F.3d 256, 260 (3d Cir. 2006) (*quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure* § 1357 (3d ed. 2004)).

A defendant may move to dismiss a complaint for plaintiff's failure to join an indispensable party. See Fed. R. Civ. P. 12(b)(7), 19. It is the movant's burden to prove that a non-party is indispensable to the adjudication of the action. *Am. Home Mortgage Corp. v. First Am. Title Ins. Co*., No. 07-1257, 2007 U.S. Dist. LEXIS 83337, 2007 WL 3349320, at *3 (D.N.J. Nov. 9, 2007) (*citing Fed. Home Loan Mortgage Corp. v. Commonwealth Land Title Ins. Co*., No. 92-5255, 1993 U.S. Dist. LEXIS 4051, 1993 WL 95494, at *5 (E.D. Pa. March 31, 1993)).  Rule 19 governs when joinder of a party is mandatory. Courts considering a Rule 19 motion must undertake a two-step inquiry. *See Gen. Refractories Co. v. First State Ins. Co*., 500 F.3d 306, 312 (3d Cir. 2007); *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc*., 11 F.3d 399, 404 (3d Cir. 1993). The reviewing court must first determinate whether the absent party is "necessary" to the action. *Gen. Refractories Co.*, 500 F.3d at 312. A party is "necessary" -- and must be added to the action -- if joinder is feasible. See Fed. R. Civ. P. 19(a); *Gen. Refractories Co*., 500 F.3d at 312. However, upon

22

concluding that a party is "necessary," but joinder of said party is infeasible (e.g., where joinder destroys diversity of the parties and thus, the court's subject matter jurisdiction), the court looks to Rule 19(b) to determine if "in equity and good conscience," the party is "indispensable." Fed. R. Civ. P. 19(b). Should a court determine that the party is "indispensable," the court must determine whether "the action should proceed among the parties before it, or should be dismissed." *See Temple v. Synthes Corp.*, 498 U.S. 5, 8, 111 S. Ct. 315, 112 L. Ed. 2d 263 (1990); *Janney*, 11 F.3d at 405 The Third Circuit has held that upon determining a party is "indispensable," the action cannot proceed. *Gen. Refractories Co.*, 500 F.3d at 312 (citing Janney, 11 F.3d at 404).

## ARGUMENT

### 1. Plaintiff Has Failed to State a Plausible Cause of Action for Fraud

Pleading securities fraud is subject to Fed. R. Civ. P. 9(b)'s heightened pleading requirement. *See Mizzaro v. Home Depot, Inc*., 544 F.3d 1230, 1237 (11th Cir. 2008) (holding that "securities fraud claims, like other types of fraud claims, have always been subject to Fed. R. Civ. P. 9(b)'s heightened pleading requirements"). Although Rule 9(b) allows that mental states "may be alleged generally," consistent with the requirements elaborated upon by the Supreme Court in *Iqbal* and *Twombly*, the SEC's complaint must contain a factual basis supporting a plausible inference that the defendants acted with scienter. *SEC v. Steffes*, 805 F.

Supp. 2d 601, 618 (N.D. Ill. 2011) (citations omitted); *SEC v. Geswein*, No. 10-1235, 2011 U.S. Dist. LEXIS 111906, 2011 WL 4565898, at *21 (N.D. Ohio Aug. 5, 2011), Report and Recommendation adopted in part, rejected in part on other grounds, 2011 U.S. Dist. LEXIS 111893, 2011 WL 4541303 (N.D. Ohio Sept. 29, 2011); *SEC v. Lee*, 720 F. Supp. 2d 305, 321 (S.D.N.Y. 2010).

The Supreme Court has explicitly held "that the Commission is required to establish scienter as an element of a civil enforcement action to enjoin violations of § 17 (a)(1) of the 1933 Act, § 10 (b) of the 1934 Act, and Rule 10b-5 promulgated under that section of the 1934 Act." *Aaron v. SEC*, 446 U.S. 680, 701-702 (1980).

Scienter, or the intent to defraud, may be inferred by circumstantial evidence, but must also be balanced with evidence of a contrary, non-fraudulent scienter. As the Court in *SEC v. McGee*, 895 F. Supp. 2d 669, 685 (E.D.P.A. 2012) explained, the allegations raised by the SEC "by themselves do not support a plausible inference that he acted with scienter. Indeed, the remaining allegations and **what is not alleged** reasonably permit a contrary inference." (emphasis added)

Here, the Court must balance the allegations raised by the SEC with the facts referenced, but not alleged, to determine whether Defendant Parmar acted with the intent to defraud.

### i. The Allegedly Fraudulent Statements Pleaded by Plaintiff Were Isolated, Cherry-Picked Statements That Are Completely Inconsistent With All The True Data and Representations Made During the Due Diligence Process and, in Some Instances, Even Internally Contradictory

In paragraphs 64-73 of the complaint, Plaintiff outlines the specific representations from Parmar and his co-defendants that Plaintiff claims were fraudulent. However, an examination of these representations quickly reveals the abject implausibility of Plaintiff's claims.

Plaintiff alleges that co-defendant Chivukula created and emailed to Investor-1 a spreadsheet on May 19, 2016 that included materially false statements about MDRX's EBITDA. *Complaint* ¶64. However, even if true, it is implausible to believe that Investor-1 would have relied upon this spreadsheet, especially since they were subsequently shown all the underlying data, which clearly showed that MDRX had no EBITDA.

Similarly, Plaintiff pleads that Parmar forwarded an email on June 9, 2016 to Investor-1 with three spreadsheets that falsely claimed that in 2015 CHT had total revenues of more than $108 million and approximately $25 million in EBITDA, including the fictitious revenues from NorthStar, Phoenix, and MDRX. *Complaint* ¶65. Again, it is implausible to believe that a sophisticated investor like Investor-1 would rely on this alleged spreadsheet instead of the data subsequently provided that established that CHT's 2015 revenue was only $76 million. Moreover, as a publicly traded company, CHT publicly reported its 2015 revenues as $76 million. Finally, the addition of fake revenue from MDRX is contradicted by Plaintiff's own allegations that CHT claimed to have acquired MDRX on February 10, 2016.

25

Investor-1 would need to be grossly incompetent to believe that CHT's 2015 revenue would include revenue from a subsidiary that was not acquired until the following year.

Similarly, when Plaintiff alleges that "[o]n June 29, 2016, Investor-1 asked Chivukula in an email whether the LTM [i.e., last twelve months] 2015 numbers include MDRX in all periods? Chivukula responded, Yes [Investor-1 representative], that is correct," (*Complaint* ¶69), this allegation requires the gross incompetence or willful blindness of Investor-1 to believe that MDRX revenues would be reported prior to its alleged acquisition.

Any statements allegedly made by Parmar about the acquisitions of MDRX and Phoenix in June 2016 (*Complaint* ¶¶66, 68) cannot possibly have been relied upon by Investor-1, as subsequent data and due diligence materials showed that these were empty SPACs.  Additionally, as outlined in the complaint, MDRX was purportedly an Akron Ohio based company.  *Complaint* ¶44.  However, in the countless powerpoint presentations shown to Chinh Chu, Truc To and the entire due diligence team, slides were presented showing a map of the United States marking the locations of all of CHT's offices with the addresses around the outside. Noticeably missing from these slides are any offices in Akron Ohio.

Next, Plaintiff alleges that Parmar emailed Investor-1 a "Revenue Analysis" spreadsheet that included a list of 682 purported CHT customers, including 44

purported MDRX customers and 71 purported Phoenix customers. *Complaint* ¶70

This grossly inflated number of CHT customers is belied by the fact that CHT

provided Chinh Chu and Truc To with unfettered access to the Pegasus system,

which includes all accurate information on CHT's 191 customers.  While Chinh Chu

has been careful not to allow Parmar to access the KPMG report, this is one

allegation that can easily be proven that Investor-1 did not rely upon.  The email in

question was allegedly sent on July 17, 2016, yet McKinsey & Company issued their

report on July 27, 2016 to accurately reflected 191 customers.  *Parlatore*

*Declaration, Exhibit L*, p. 61.  McKinsey's report was based on their own access,

alongside Truc To and Chinh Chu, to the Pegasus system.  It is implausible to believe

that Investor-1 could have relied upon this email when their own consultants clearly

did not.

Plaintiff claims that Chivukula emailed Investor-1 on July 19, 2016, which

claimed that several employees of Phoenix had transitioned to CHT. *Complaint* ¶72.

This claim is belied by the fact that full employee records were examined by Truc

To and the KPMG team, without a single employee working for Phoenix or

transitioning from Phoenix.

Aside from a single email sent by Zaharis, not Parmar, on January 24, 2017

(*Complaint* ¶73), all the allegations of fraudulent statements by Parmar were made

on or before July 21, 2016, very early in the due diligence process.  Thus, to find

27

any of these allegations plausible, the Court must first disregard the entire due diligence process.

The only way Plaintiff's allegations could plausibly show the requisite scienter or intent to defraud is if the Court presumes that Defendants targeted investors that were either grossly incompetent or intentionally reckless and, moreover, that the target objective of the fraud was to induce this incompetent investor into buying a company at a 50% discount from its actual value. This theory simply is not plausible and therefore must be dismissed.

## ii. Plaintiff Has Failed to Establish, and Cannot Establish, Justifiable Reliance Upon These Allegedly Fraudulent Statements by Investor-1

While normally only applicable to private causes of action, justifiable reliance is a relevant consideration in this case, because there is a single identifiable alleged victim, who had continuous communications with Defendants regarding the financial condition of CHT. If Defendants truly intended to defraud Investor-1, they would have taken substantial steps to ensure that Investor-1 did rely on those representations to its detriment.

An obvious question would be, if Investor-1 was aware that MDRX and Phoenix were empty shells, why would they go through with the deal? As clearly established through the due diligence materials (and subsequent actions), Chinh Chu had a significant financial incentive to push the CHT deal through. Investor-1 successfully acquired CHT through the going private transaction at a fraction of the

actual enterprise value.  Chinh Chu's awareness and actual knowledge of the bookkeeping irregularities gave him the leverage to then extort Parmar, file a fraudulent bankruptcy, and steal the valuable assets of CHT for pennies on the dollar.

Consider that, at an enterprise value of over $500 million, Investor-1 acquired 51% at a cost of approximately $150 million, using bank loans and outside investor capital.  He then purchased that $500 million asset out of the bankruptcy for only $29.1 million, leaving the banks and the investors holding the bag.

Defendant Parmar, on the other hand, had a 56% interest in a publicly traded $500 million company and, as a result of Chinh Chu's machinations, has lost everything and found himself criminally charged and facing this SEC complaint.

## 2. Plaintiff Has Failed to Join Two Necessary Parties, Chinh Chu and Truc To as Defendants

Ordinarily, determinations by regulatory agencies like the SEC about which parties to name in an enforcement action are presumed immune from judicial review. *SEC v. Princeton Econ. Int'l Ltd*., 2001 U.S. Dist. LEXIS 948, *3 *Citing Heckler v. Chaney*, 470 U.S. 821, 832 (1985); *New York City Employees' Retirement Sys. v. S.E.C*., 45 F.3d 7, 11 (2d Cir. 1994); *Marlow v. U.S. Dep't of Educ*., 820 F.2d 581, 582 (2d Cir. 1987).  However, this presumption is neither absolute or statutory.

The case at bar differs significantly from these cases which, ordinarily involve a defendant claiming that since others were involved, they should have been named as defendants as well.  Here, the parties that were not joined are truly necessary as

29

they were the ones who communicated the fraudulent misrepresentations to Investor-1, not the Defendants.

Under Plaintiff's theory, Defendants made fraudulent misrepresentations to Truc To and Chinh Chu for the purpose of having Investor-1 buy CHT. However, as discussed *supra*, Defendants provided all accurate data to Chinh Chu and Truc To. If Investor-1 was provided with fraudulent representations that induced it into this deal, it was because Chinh Chu and Truc To intentionally communicated false information, or were willfully blind to the true and accurate data provided by Defendants and therefore recklessly made false representations to Investor-1.

It would be offensive to "equity and good conscience" to require Defendants to proceed in this matter and defend themselves without the parties who actually made the fraudulent misrepresentations to Investor-1. This is especially true considering the 3rd Circuit's holding that "the plain language of § 10(b) and corresponding Rule 10b-5 do not contemplate the general failure to rectify misstatements of others" and declined to impose such a duty. *United States v. Schiff*, 602 F.3d 152, 167 (3rd Cir. 2010).

Unless Chinh Chu and Truc To are added as defendants to this action, the Court should decline to allow the case to proceed and should dismiss the case as to Defendant Parmar.

**CONCLUSION**

For all the reasons stated herein, Defendant respectfully requests that this Court issue an Order dismissing this case as to Defendant Parmar, together with such other and further relief as the Court deems appropriate.

Dated:     August 15, 2018
           Hoboken, New Jersey


                              Respectfully submitted,


                              Timothy C. Parlatore, Esq.
                              *Attorney for the Defendant, Paul Parmar*
                              221 River Street, 9th Floor
                              Hoboken, New Jersey 10006
                              212-679-6312
                              212-202-4787 Facsimile
                              timothy.parlatore@parlatorelawgroup.com