UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____X

U.S. SECURITIES AND EXCHANGE
COMMISSION,

               Plaintiffs,             **Docket No.: 18-CV-9284-MCA-MAH**

    -against-

PAUL PARMAR, et. al.

              Defendants.

_____X

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT'S MOTION TO DISMISS

Timothy C. Parlatore, Esq.
*Counsel for the Defendant Paul Parmar*
One World Trade Center, Suite 8500
New York, NY  10007
212-679-6312
timothy.parlatore@parlatorelawgroup.com

## PRELIMINARY STATEMENT

This case involves a unique set of circumstances, where the head of a private investment firm conspired to purchase a controlling interest in a public company at half its actual value and take it private. He used bank loans and capital from other investors, rather than his own money, to finance the transaction and then arranged to assign responsibility for this debt to the company he had just purchased. Subsequent to the purchase, the investment firm head first attempted to extort Defendant, the former majority stakeholder and CEO of the public company, into abandoning his remaining equity in the business; when that failed,  he orchestrated a fraudulent bankruptcy filing so that he could use straw purchasers to buy that company out of the bankruptcy at a fraction of the cost, with 100% equity and debt free, while leaving the investors and banks with uncollectible debts. In a brazen move to sideline the minority shareholder and CEO from derailing this elaborate plan, he made false representations to the U.S. Department of Justice ("DOJ"), Federal Bureau of Investigations ("FBI") and U.S. Securities and Exchange Commission ("SEC" or Plaintiff) to have the minority shareholder arrested and falsely charged. The case at bar was filed by the SEC in reliance upon those false representations, which pointed Plaintiff towards the wrong defendant(s).

The factual allegations in the complaint focus on the events leading up to "Investor-1"'s acquisition of a controlling interest in Constellation Healthcare

Technologies, Inc. ("CHT") – specifically, a collection of statements allegedly made by Defendant Parmar and his co-defendants to representatives of Investor-1. However, Plaintiff has failed to properly plead a plausible cause of action for fraud based on these isolated, cherry-picked statements that are completely inconsistent with the "scores of documents" provided by Parmar to Investor-1 that Plaintiff relied upon and incorporated into the complaint by reference, including "acquisition agreements, financial statements, customer agreements, invoices, and due-diligence materials."[1]

Plaintiff's theory that these few carefully selected and quoted sections somehow fraudulently induced Investor-1 to move ahead with the transaction fails to meet the heightened pleading requirement for fraud cases, as the documents relied upon and incorporated by reference overwhelmingly establish that Investor-1 was given complete and total access to all of the actual accurate data and spent between $7 and $12 million on due diligence to review that data. It is utterly implausible that such a highly sophisticated investor could spend over $7 million on due diligence and then make an investment decision based on a few inaccurate statements made very early in the process by Defendant Parmar, rather than by examining and relying upon the mountains of legitimate data that were subsequently provided. Furthermore, even if Investor-1 had somehow overlooked the mountains of accurate data with which

_____

[1] Quoting from Paragraph 3 of Plaintiff's Complaint.

they were provided, they are hard pressed to claim that they were unaware of the nature of the acquisitions when DOJ informed Bank of America 10 days prior to closing that the acquisitions were raising red flags at DOJ and were potentially fraudulent.  Moreover, an article in Financial Times laid out further doubts on the acquisitions 4 days prior to closing.   This article quoted Chinh Chu and was only published after months of Chu's effort to prevent or delay its publication.  Finally, BofA – the majority financier of the transaction -- informed DOJ investigators that they did not ever see or rely upon the documents cited by Plaintiff in the complaint.

The documents relied upon by Plaintiff, and incorporated into the complaint by reference, clearly establish that Defendant Parmar gave accurate data and information and, if anyone made fraudulent misrepresentations that induced Investor-1 to invest, those came from at least two individuals, who were not named as defendants – Chinh Chu and Truc To, as well as Bank of America.

This complaint, along with other publicly filed documents in this Court, and the U.S. Bankruptcy Court for the Eastern District of New York, provide strong evidence that Chinh Chu and Truc To, working together with Bank of America, defrauded Investor-1, the other lending banks, the public shareholders of CHT and the bankruptcy court, all while engaging in insider trading and obstruction of justice. There is no question that there were irregularities in the books of CHT and in the acquisition of CHT by Investor-1. Unfortunately, Plaintiff has selected the wrong

3

defendants in bringing this action. This complaint should be dismissed as to Defendant Parmar.

## STATEMENT OF FACTS

Parmar and other investors acquired Orion Healthcorp, Inc. ("Orion") in June 2013. Orion is a medical billing, collections, and practice management service company, which became a subsidiary of CHT. As CEO of CHT, Parmar grew the company over the next several years through an aggressive growth strategy of acquiring smaller service providers and making them subsidiaries of Orion. The value of these acquisitions to CHT is primarily in their customer lists and relationships, as these medical practices would then be serviced by the main CHT platform.  When first formed, CHT operated solely as a privately-owned company.

CHT grew through these acquisitions and eventually went public on the London Stock Exchange's Alternative Investment Market ("AIM") to help raise money to fund future acquisitions. At that time, Orion held eight subsidiary companies and continued with an aggressive acquisition and growth strategy.  The manner in which this growth strategy was structurally implemented was that CHT would form a new shell LLC, then acquire a new subsidiary to place into the shell. This method of corporate structuring is not uncommon and would have been easily recognized by any potential investors, or by agencies performing a due diligence review.  Most of the CHT shares were held by various entities, which Parmar

4

managed and controlled (the "Parmar entities").

By the time Parmar wanted to take CHT back private, it had grown to 14 operational subsidiaries, along with several holding companies or shells, which were formed for the purpose of being filled with new acquisitions.

### Secondary Offerings

One of the primary purposes of taking CHT public was to raise money to fund acquisitions, use for operations, working capital and other purposes as the business saw fit. One of the methods used by CHT was to make secondary offerings, usually accompanied by a forward-looking statement about a potential acquisition, to raise additional capital. Plaintiff wants to restate the purpose of the raises as exclusively for acquisitions but fails to highlight that the economic reality of any secondary raise up is to sell company shares at a discounted price. The money raised goes to the company for its needs, regardless of whether the intended acquisition closes or not. For example, in the last raise up, CHT was only seeking a raise of 16 - 20 million for acquisition of MDRX by selling shares but the investors purchased shares worth over 40 million dollars. The company was permitted to keep the proceeds even though there was no acquisition mentioned or even contemplated above and beyond the need of 16 - 20 million dollars. Clearly the funds were CHT's property as the investors were given assets in return of greater value; the shares of the company at a discount to daily trading. None of the investors were US citizens and, by law, US citizens were

prohibited from purchasing these shares, as the law only allows such shares to be specifically designated and only sold after they have been aged at least 1 year before a US citizen can acquire such shares.

Plaintiff is alleging that these were fraudulent because the potential acquisitions did not close as anticipated, however all of the allegedly fraudulent misrepresentations pleaded are from after the secondary offerings had already closed and share purchases had been completed.

As outlined in the complaint, three of the shells that were formed, but never filled, were Northstar First Health, LLC ("Northstar"), Phoenix Health, LLC ("Phoenix"), and MDRX Medical Billing, LLC ("MDRX"). All three had been formed for the purpose of acquiring new subsidiaries and used in the raise ups on the London AIM exchange. While these raise ups were successful, the acquisitions did not go exactly according to plan and two of these shells, Phoenix and MDRX, remained empty shells.[2] As with all investments into CHT, the funds raised from these secondary offerings went into the main operating accounts of CHT.

### Chinh Chu Acquires CHT

Chinh Chu is the senior managing director and founder of CC Capital[3].

_____

[2] Plaintiff has alleged that Parmar and his associates provided false information, in the form of press releases and financial statements, indicating that these empty shells were actual acquisitions. For the limited purpose of this motion, these allegations are presumed to be true.

[3] The complaint is unclear as to what entity Investor-1 is, but it appears that Investor-

Before launching CC Capital, Chinh Chu spent 25 years working at The Blackstone Group, focused on building its Private Equity business.

In February 2016, Parmar and Chinh Chu began discussions of having CC Capital bid on CHT.  Chinh Chu reviewed the public data of CHT.  As their discussions anticipated Parmar remaining as CEO and controlling a significant percentage of the ownership, through the Parmar entities, Chinh Chu wanted Parmar to personally contribute $10 million cash, in addition to the equity in CHT that the Parmar entities owned.

Over the many months of negotiations leading up to the go private transaction, Chinh Chu and his due diligence team on behalf of CC Capital were provided with significant access to all of the accurate information and data on CHT's financial condition and were fully aware of exactly what they were investing in.

CC Capital's due diligence began with a review of all the publicly available information and financials of CHT.  Later, CC Capital hired Truc To of KPMG to head the due diligence efforts.  Discovery in Parmar's related criminal case has revealed that, from the early stages of the due diligence process, Chinh Chu and Truc To were aware of the possible existence of the empty shells.  Indeed, Truc To advised Chinh Chu to walk away from the deal if he had any suspicions of fraud, and Chu

---

1 may be an investor that Chinh Chu and CC Capital brought to the CHT deal or, perhaps more likely, may even be CC Capital itself.   Because of this ambiguity, the terms CC Capital and Investor-1 are being used interchangeably here.

7

refused, claiming that to walk away would set CC Capital back "years." Instead, the due diligence process went forward, and Chinh Chu and Truc To were given access to all of CHT's data, including a proprietary software platform, Pegasus, to ensure that they were reviewing accurate data. In addition to having ongoing access to all of the real time data through Pegasus, KPMG and Truc To asked CHT to provide them with all of the real data for the month of December 2015 and for the month of June 2016. This data was provided to KPMG, Truc To and CC Capital. Although they submitted several follow-up questions on the data after analyzing it, there were no questions asked about the fact that the data provided showed the acquisitions to be empty, with no doctors or claims. Even had there been any ambiguity before this, this data review alone would have made it crystal clear to CC Capital and KPMG that the acquisitions in question were in fact empty shells waiting to be filled with assets. This data, as well as the only independent valuation of CHT performed to date, showed that an accurate enterprise value for CHT was over $500 million, a price that Chinh Chu and CC Capital was unwilling to pay.

Chinh Chu and Truc To manipulated the process in an effort to purchase CHT for a significantly discounted rate of $290 million, of which the Parmar parties funded $80 million of equity, CC Capital funded $81 million of equity and the remainder was funded by a bank loan taken by CHT, as well as cash from the company itself. As all of the normal safeguards, such as a fairness opinion and a legitimate go-shop

period, were bypassed, Chinh Chu ultimately gave the members of the Special Committee of the Board of Directors of CHT indemnification agreements and additional compensation to ensure that they would approve his unreasonable terms. These manipulations were successful, and the Special Committee agreed to accept a price far lower than the actual enterprise value of CHT. On January 31, 2017, the going private transaction closed, with CC Capital gaining a 51% stake in CHT.

The deal was partially financed, as noted above, by a loan from a consortium of banks organized and led by Bank of America Merrill Lynch (BofA). [4] Although little is known about how the financing was obtained from BofA, as they communicated directly with Chinh Chu and his associates rather than with Parmar or any other agent of the borrower, it has been revealed through discovery in the related criminal case against Parmar that BofA sent commitment letters months before any substantial due diligence was performed by KPMG. BofA did no due diligence of their own and performed no audit. This is noteworthy because those early commitment letters reveal that BofA intended from the beginning for CHT – the entity being purchased – to be the borrower, not Investor-1 or any other buyer.

---

[4] The portion of this Statement of Facts that relates to the actions of Bank of America, and actions by Chu and To following the closing of the transaction, are relevant only to the Court's determination of the Rule 12(b)(7) branch of Defendant's motion, as they contain facts outside of the pleadings and do not rely upon documents that were incorporated into the pleadings by reference. They are in no way intended to convert this motion into one for summary judgment.

Presumably, BofA agreed to provide such significant financial backing without any substantive inquiry because they were relying on the word of Chinh Chu, with whom they had worked before and with whom they expected to continue working on larger deals, such as Chu's $6.9 billion dollar deal to take Dun & Bradstreet private. BofA's level of knowledge – as well as their total blindness to their fiduciary duties to the other banks in the lending consortium – is further revealed by their reaction to a warning from the Department of Justice to a Vice President in the Fraud Investigations Group at BofA. Despite being told by DOJ representatives before the go private transaction closed that the proposed transaction was "setting alarms off," as well as being referred to the open source information that led to a belief that the bank was being defrauded, BofA took no action whatsoever on the warning. They did not ask for a delay, performed no additional due diligence, and failed to inform any other bank of the warning that they had received. The only conceivable reason for this kind of reaction is that BofA did not react with alarm because they already knew all of the information that they had been given and believed that it was in the best interests of their organization to proceed. The transaction closed at the end of January with BofA's financing intact.

While Chinh Chu would have done quite well, financially, by allowing Parmar to continue to run CHT, while cleaning up any recordkeeping issues, and allowing the pending acquisitions to proceed, he was able to profit even more by taking

10

advantage of those record keeping issues in order to force Parmar out and then using the excessive bank debt that he himself had put on CHT to put it into bankruptcy and steal CHT for himself.

## After Closing

After the fact, in an effort to get rid of Parmar and steal 100% ownership of the company, Chinh Chu pretended that information had been falsely presented during the due diligence phase and claimed that he had been unaware of the true operating structure of CHT. He used this pretext to force Parmar out, file a fraudulent bankruptcy for CHT, and to deceive the SEC and DOJ into filing charges against Parmar.

Essential to Chinh Chu's corrupt plan was to ensure that the KPMG due diligence team did not spill the beans about their findings. Immediately after closing, Chinh Chu moved to hire Truc To as the CFO of CHT. Chinh Chu rewarded Truc To's dishonest work as the head of KPMG's due diligence team by offering him a compensation package greater than that of the CEO. At the same time, Chu instituted a search committee to find a new CEO so that Parmar could be forced out and replaced.

In furtherance of his scheme, Chinh Chu then illegally accessed and misappropriated Parmar's private emails, taken without permission or authority from Parmar's personal server. He then provided these feloniously obtained emails, including emails covered by attorney-client privilege, to Plaintiff's counsel, who quotes from them liberally in the complaint.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim upon which relief can be granted." When reviewing a motion to dismiss, courts must first separate the factual and legal elements of the claims and accept all the well-pleaded facts as true. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). All reasonable inferences must be made in the plaintiff's favor. *See In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 314 (3d Cir. 2010).

To survive a motion to dismiss, the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). This standard requires the plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully," but does not create so high of a standard as to be a "probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

The Third Circuit requires a three-step analysis to meet the plausibility standard mandated by *Twombly* and *Iqbal*. First, the court should "outline the elements a plaintiff must plead to state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the court should "peel away" legal conclusions that are not entitled to the assumption of truth. *Id*.; *see also Iqbal,* 556 U.S. at 678- 79

("While legal conclusions can provide the framework of a complaint, they must

be supported by factual allegations."). It is well-established that a proper complaint

"requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal

quotations and citations omitted). Finally, the court should assume the veracity of all

well-pled factual allegations, and then "determine whether they plausibly give rise

to an entitlement to relief." *Bistrian*, 696 F.3d at 365 (*quoting Iqbal*, 556 U.S. at 679).

A claim is facially plausible when there is sufficient factual content to draw a

"reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*,

556 U.S. at 678. The third step of the analysis is "a context-specific task that requires

the reviewing court to draw on its judicial experience and common sense." *Id*. at

679.

   A defendant may move to dismiss a complaint for plaintiff's failure to join an

indispensable party. See Fed. R. Civ. P. 12(b)(7), 19. It is the movant's burden to

prove that a non-party is indispensable to the adjudication of the action. *Am. Home

Mortgage Corp. v. First Am. Title Ins. Co*., No. 07-1257, 2007 U.S. Dist. LEXIS

83337, 2007 WL 3349320, at *3 (D.N.J. Nov. 9, 2007) (*citing Fed. Home Loan

Mortgage Corp. v. Commonwealth Land Title Ins. Co*., No. 92-5255, 1993 U.S. Dist.

LEXIS 4051, 1993 WL 95494, at *5 (E.D. Pa. March 31, 1993)). Rule 19 governs

when joinder of a party is mandatory. Courts considering a Rule 19 motion must

13

undertake a two-step inquiry. *See Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007); *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 (3d Cir. 1993). The reviewing court must first determine whether the absent party is "necessary" to the action. *Gen. Refractories Co.*, 500 F.3d at 312. A party is "necessary" -- and must be added to the action -- if joinder is feasible. *See* Fed. R. Civ. P. 19(a); *Gen. Refractories Co.*, 500 F.3d at 312. However, upon concluding that a party is "necessary," but joinder of said party is infeasible (e.g., where joinder destroys diversity of the parties and thus, the court's subject matter jurisdiction), the court looks to Rule 19(b) to determine if "in equity and good conscience," the party is "indispensable." Fed. R. Civ. P. 19(b). Should a court determine that the party is "indispensable," the court must determine whether "the action should proceed among the parties before it, or should be dismissed." *See Temple v. Synthes Corp.*, 498 U.S. 5, 8, 111 S. Ct. 315, 112 L. Ed. 2d 263 (1990); *Janney*, 11 F.3d at 405 The Third Circuit has held that upon determining a party is "indispensable," the action cannot proceed. *Gen. Refractories Co.*, 500 F.3d at 312 (citing *Janney*, 11 F.3d at 404).

## ARGUMENT

### 1. Plaintiff Has Failed to State a Plausible Cause of Action for Fraud

Pleading securities fraud is subject to Fed. R. Civ. P. 9(b)'s heightened pleading requirement. *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008)

14

(holding that "securities fraud claims, like other types of fraud claims, have always been subject to Fed. R. Civ. P. 9(b)'s heightened pleading requirements"). Although Rule 9(b) allows that mental states "may be alleged generally," consistent with the requirements elaborated upon by the Supreme Court in *Iqbal* and *Twombly*, the SEC's complaint must contain a factual basis supporting a plausible inference that the defendants acted with scienter. *SEC v. Steffes*, 805 F.Supp. 2d 601, 618 (N.D. Ill. 2011) (citations omitted); *SEC v. Geswein*, No. 10-1235, 2011 U.S. Dist. LEXIS 111906, 2011 WL 4565898, at *21 (N.D. Ohio Aug. 5, 2011), Report and Recommendation adopted in part, rejected in part on other grounds, 2011 U.S. Dist. LEXIS 111893, 2011 WL 4541303 (N.D. Ohio Sept. 29,

2011); *SEC v. Lee*, 720 F. Supp. 2d 305, 321 (S.D.N.Y. 2010); *SEC v. Kearns*, 691 F.Supp. 2d 601, 609 (N.J. Dist.Ct. 2010).

The Supreme Court has explicitly held "that the Commission is required to establish scienter as an element of a civil enforcement action to enjoin violations of § 17 (a)(1) of the 1933 Act, § 10 (b) of the 1934 Act, and Rule 10b-5 promulgated under that section of the 1934 Act." *Aaron v. SEC*, 446 U.S. 680, 701-702 (1980); *see also SEC v. Infinity Group Co.*, 212 F.3d 180 (3d Cir. 2000).

Scienter, or the intent to defraud, may be inferred by circumstantial evidence, but must also be balanced with evidence of a contrary, non-fraudulent scienter. As the Court in *SEC v. McGee*, 895 F. Supp. 2d 669, 685 (E.D.P.A. 2012) explained in

15

finding that scienter had not been sufficiently plead, the allegations raised by the SEC "by themselves do not support a plausible inference that he acted with scienter. Indeed, the remaining allegations and **what is not alleged** reasonably permit a contrary inference." (emphasis added)

Here, the Court must balance the allegations raised by the SEC with the facts referenced, but not alleged, to determine whether Defendant Parmar acted with the intent to defraud Investor-1.

### i. Plaintiff has Failed to Properly Plead That Plaintiff Justifiably Relied Upon any of the Allegedly Fraudulent Statements or that these Cherry-Picked Statements Plausibly Make out a Fraud

In paragraphs 64-73 of the complaint, Plaintiff outlines the specific representations from Parmar and his co-defendants that Plaintiff claims were fraudulent. However, an examination of these representations quickly reveals the abject implausibility of Plaintiff's claims that Investor-1 did or could have materially relied upon these statements.

Plaintiff alleges that co-defendant Chivukula created and emailed to Investor-1 a spreadsheet on May 19, 2016 that included materially false statements about MDRX's EBITDA. *Complaint* ¶64. However, even if true, it is implausible to believe that the sophisticated parties behind Investor-1 would have relied upon this spreadsheet, particularly since they were subsequently shown all of the accurate underlying data, which clearly showed that MDRX had no EBITDA.

Similarly, Plaintiff pleads that Parmar forwarded an email on June 9, 2016 to Investor-1 with three spreadsheets that falsely claimed that in 2015 CHT had total revenues of more than $108 million and approximately $25 million in EBITDA, including the fictitious revenues from NorthStar, Phoenix, and MDRX. *Complaint* ¶65. Again, it is implausible to believe that a sophisticated investor like Investor-1 would rely on this alleged spreadsheet instead of on the original data subsequently provided that established that CHT's 2015 revenue was only $76 million. Moreover, as a publicly traded company, CHT *publicly reported* its 2015 revenues as $76 million. Finally, the addition of fake revenue from MDRX is contradicted by Plaintiff's own allegations that CHT claimed to have acquired MDRX on February 10, 2016. Investor-1 would need to be grossly incompetent to believe that CHT's 2015 revenue would include revenue from a subsidiary that was not even acquired until the following year.

Similarly, when Plaintiff alleges that "[o]n June 29, 2016, Investor-1 asked Chivukula in an email whether the LTM [i.e., last twelve months] 2015 numbers include MDRX in all periods? Chivukula responded, Yes [Investor-1 representative], that is correct," (*Complaint* ¶69), this allegation requires the gross incompetence or willful blindness of Investor-1 to believe that MDRX revenues would be reported prior to its alleged acquisition.

Next, Plaintiff alleges that Parmar emailed Investor-1 a "Revenue Analysis"

17

spreadsheet that included a list of 682 purported CHT customers, including 44 purported MDRX customers and 71 purported Phoenix customers. *Complaint* ¶70. However, it is implausible to believe that a sophisticated investor would have relied upon such a spreadsheet and not the actual underlying data and documents which were also provided during the due diligence process.

Plaintiff also claims that Chivukula emailed Investor-1 on July 19, 2016 and claimed that several employees of Phoenix had transitioned to CHT. *Complaint* ¶72. This claim is also implausible, given the fact that full employee records were examined by Truc To and the KPMG team.

Aside from a single email sent by Zaharis, not Parmar, on January 24, 2017 (*Complaint* ¶73), all the allegations of fraudulent statements by Parmar were made on or before July 21, 2016, very early in the due diligence process and more than five months before the closing took place. Thus, to find any of these allegations plausible, the Court must first disregard the entire due diligence process, which was conducted with the aid of a forensic company that specifically advertises its services in identifying and mitigating the risk of corporate fraud or misconduct, at a cost of several million dollars. The Court must assume not only that Investor-1 was grossly incompetent, but that the process specifically designed to uncover any efforts to mislead Investor-1 was likewise rife with incompetence or deceit by Investor-1's employees and associates.

18

The only way Plaintiff's allegations could plausibly show the requisite scienter or intent to defraud is if the Court presumes that Defendants cleverly targeted investors that were either grossly incompetent or intentionally reckless and, moreover, that the target objective of the fraud was to induce this incompetent investor into the much less clever scheme of buying a company at a 50% discount from its actual value.  This theory simply is not plausible and therefore must be dismissed.

**ii.      Plaintiff Has Failed to Allege a "Scheme or Artifice to Defraud" Through Their Failure to Plead any Harm to the "Victim."**

Glaringly absent from the pleadings is any theory of a scheme or artifice to defraud related to the actual value of CHT.  It is axiomatic that a scheme to defraud must anticipate some intended harm to the victim, such as the purchase of an asset worth less than the victim was led to believe.  Conversely where, as here, the "victim" purchases an asset for *less* than its actual value, Plaintiff fails to properly plead a scheme to defraud.

While Plaintiff speaks generally about how Parmar allegedly "fraudulently induced Investor-1 to enter into the go-private transaction," (*Complaint* ¶2) Plaintiff fails to allege any facts to support this theory and conspicuously declines to make any attempt to plead with particularity what the "actual value" of CHT was, or even allege that the actual value was less than the price paid.

Plaintiff alleges that the transaction "valued CHT at approximately $309.4

million, or $3.36 per share, an approximately 45% premium to CHT's stock price." *Complaint* ¶4, 74. Not only does Plaintiff fail to allege what the actual value of CHT is, they incredibly don't even include a non-specific allegation that this value was false or inflated.

On information and belief, Plaintiff's failure to address the total enterprise value is not simply an oversight, but rather a recognition that there is absolutely zero evidence to support the notion that the total enterprise value is anything less than the $309.4 million that the Private Investment Firm valued it at. On the contrary, the due diligence documents relied upon by Plaintiff demonstrates that the actual total enterprise value of CHT was significantly greater than $309.4 million at the time of the go-private transaction.

As outlined in *United States v. Starr*, 816 F.2d 94, 98, (2nd Cir. 1987):

> Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim. Moreover, the harm contemplated must affect the very nature of the bargain itself. Such harm is apparent where there exists a "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver."

*Id., quoting United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2nd Cir. 1970).

## 2. Plaintiff Has Failed to Join Three Necessary Parties, Chinh Chu, Truc To and Bank of America as Defendants

Ordinarily, determinations by regulatory agencies like the SEC about which

20

parties to name in an enforcement action are presumed immune from judicial review. *SEC v. Princeton Econ. Int'l Ltd.*, 2001 U.S. Dist. LEXIS 948, *3 *citing Heckler v. Chaney*, 470 U.S. 821, 832 (1985); *New York City Employees' Retirement Sys. v. S.E.C.*, 45 F.3d 7, 11 (2d Cir. 1994); *Marlow v. U.S. Dep't of Educ.*, 820 F.2d 581, 582 (2d Cir. 1987). However, this presumption is neither absolute or statutory.

The case at bar differs significantly from these cases, which ordinarily involve a defendant claiming that since others were involved, they should have been named as defendants as well.  Here, the parties that were not joined are truly necessary as they were the ones who communicated the fraudulent misrepresentations to Investor-1, not the Defendants.

Under Plaintiff's theory, Defendants made fraudulent misrepresentations to Truc To and Chinh Chu for the purpose of having Investor-1 buy CHT. However, as discussed *supra*, Defendants provided all accurate data to Chinh Chu and Truc To and gave them unfettered access to the PARCS system. If Investor-1 was provided with fraudulent representations that induced it into this deal, it was because Chinh Chu and Truc To intentionally communicated false information, or were willfully blind to the true and accurate data provided by Defendants and therefore recklessly made false representations to Investor-1.

Similarly, Bank of America, which never communicated directly with Defendants and thus could not have been misled by any representations, fraudulent

21

or otherwise, orchestrated this transaction entirely while working with Chinh Chu and his associates. BofA never spoke with nor investigated the borrowing party who would be responsible for repaying the debt, and was clearly so well aware of the financial situation of CHT that a direct warning from the Department of Justice of possible fraud left them not only unconcerned, but apparently unwilling to pass that warning along to the other banks involved in the lending process.

It would be offensive to "equity and good conscience" to require Defendants to proceed in this matter and defend themselves without the parties who actually made the fraudulent misrepresentations to Investor-1. This is especially true considering the Third Circuit's holding that "the plain language of § 10(b) and corresponding Rule 10b-5 do not contemplate the general failure to rectify misstatements of others" and refusal to impose such a duty. *United States v. Schiff*, 602 F.3d 152, 167 (3rd Cir. 2010).

Unless Chinh Chu, Truc To and Bank of America are added as defendants to this action, the Court should decline to allow the case to proceed and should dismiss the case as to Defendant Parmar.

## CONCLUSION

For all the reasons stated herein, Defendant respectfully requests that this Court issue an Order dismissing this case as to Defendant Parmar, together with such other and further relief as the Court deems appropriate.

Dated:     April 24, 2020
           New York, NY

Respectfully submitted,

Timothy C. Parlatore, Esq.
*Attorney for the Defendant, Paul Parmar*
One World Trade Center, Suite 8500
New York, New York 10007
212-679-6312
212-202-4787 Facsimile
timothy.parlatore@parlatorelawgroup.com